T.C. Memo. 2012-340

UNITED STATES TAX COURT

RAWLS TRADING, L.P., RAWLS MANAGEMENT CORPORATION, TAX
MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

RAWLS GROUP, L.P., RAWLS FAMILY, L.P., RAWLS MANAGEMENT
CORPORATION, JERRY RAWLS AND THE JERRY S. RAWLS BUSINESS
TRUST, JERRY RAWLS, TRUSTEE, PARTNERS OTHER THAN THE TAX
MATTERS PARTNER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 12937-07, 14880-07.         Filed December 5, 2012.

Michael Todd Welty, Laura L. Gavioli, and Mark Thomas, for petitioners.

Elaine H. Harris, David B. Flassing, Julie Ann P. Gasper, and Mark Edward

O'Leary, for respondent.

**[\*2]** MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  These consolidated cases[1] are a partnership-level proceeding subject to the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, sec. 402(a), 96 Stat. at 648 (codified as amended at sections 6221-6233).[2]  These cases arose out of two short sale variants of the "Son-of-BOSS" tax shelters engaged in by Jerry S. Rawls (Mr. Rawls) in 2000.[3]  The issues for decision are:  (1) whether respondent's determinations in the notices of final partnership administrative adjustments (FPAAs) issued to Rawls Group, L.P. (Group) and Rawls Trading, L.P. (Trading) are correct; and (2) whether petitioners have established a reasonable cause defense under section 6664(c) to the section 6662(a) accuracy-related penalties.

---

[1]  On December 30, 2008, these dockets were consolidated with <u>Rawls Family, L.P. v. Commissioner</u>, docket No. 12938-07.  On March 26, 2012, we dismissed the case involving Rawls Family, L.P., for lack of jurisdiction by order accompanying <u>Rawls Trading, L.P. v. Commissioner</u>, 138 T.C. 271 (2012).

[2]  Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the year at issue and all Rule references are to the Tax Court Rules of Practice and Procedure.  All dollar amounts are rounded to the nearest dollar.

[3]  <u>See</u> <u>Kligfeld Holdings v. Commissioner</u>, 128 T.C. 192 (2007) (providing a detailed description of the shelter).

**[\*3]** FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. We also incorporate the facts set forth in our prior Opinion <u>Rawls Trading, L.P. v. Commissioner</u>, 138 T.C. 271 (2012). We repeat several of the facts from our prior Opinion, as they are relevant to the issues in these cases.

<u>Jerry S. Rawls</u>

Mr. Rawls earned a bachelor of science degree in mechanical engineering from Texas Tech University in Lubbock, Texas, and a master of science degree in industrial administration from Purdue University in West Lafayette, Indiana. From 1968 through 1988 he worked for Raychem Corp., where he began as a sales engineer and eventually rose to general manager of two divisions within the company.[4] Mr. Rawls cofounded the fiber optics company Finisar Corp. (Finisar) in 1989.[5] Mr. Rawls financed his $32,000 initial investment in Finisar by taking out a second mortgage on his house; at that time, Mr. Rawls' wealth consisted

---

[4] During this time, Mr. Rawls lived in Chicago, Dallas, and California. Mr. Rawls currently resides in California.

[5] Finisar was originally incorporated in California and was reincorporated in Delaware in 1999. Finisar's corporate headquarters is in Sunnyvale, California.

[*4] only of the equity in his house. Upon formation of Finisar, Mr. Rawls received a portion of its outstanding shares of common stock. Since the company's inception, Mr. Rawls has served, variously, as Finisar's president, chief executive officer, or chairman of the board.

By 1999 Finisar had become the nation's leading provider of fiber optic subsystems and network performance tests. On November 11, 1999, Finisar announced an initial public offering (IPO) of its common stock. On November 17, 1999, Finisar made an IPO of 8,150,000 shares. At the time of the IPO, Mr. Rawls owned 8,470,627 shares of Finisar stock, which represented 20.2% of Finisar's outstanding common stock. Mr. Rawls' stock ownership in Finisar represented approximately 28% of the company's outstanding common stock before the IPO. However, because of his position at the company, Mr. Rawls was subject to a "lock up" that precluded him from selling his Finisar shares in the IPO and for a six-month period thereafter.

On March 14, 2000, Finisar announced a three-for-one public stock split, a public offering of an additional 2 million shares of common stock by Finisar , and a "secondary offering" of 5.7 million shares by the existing shareholders of Finisar. The split was to take effect on April 12, 2000, with respect to the shareholders of record as of close of business on March 27, 2000. It was

**[\*5]** contemplated that the stock offerings would be effected on or about April 7, 2000.

At the time of the IPO, Mr. Rawls had no will or estate plan in place, he had no personal lawyers, and his Finisar holdings made up substantially all of his net worth. Between February and March 2000, Mr. Rawls was busy traveling the country in advance of the upcoming secondary offering of Finisar's common stock. Mr. Rawls intended to sell approximately 600,000 shares of his Finisar common stock in this secondary offering.

The Heritage Organization

On December 8, 1999, Steven J. Lange, a representative from the Heritage Organization, L.L.C. (Heritage),[6] made an unsolicited call to Mr. Rawls to discuss Heritage's services regarding tax and estate planning. Mr. Rawls agreed to meet with a Heritage representative in person.

On December 17, 1999, Mr. Rawls met with Heritage employee Joseph Van Voorhis. Mr. Van Voorhis presented the people at Heritage as estate planners and sophisticated tax planners. According to Mr. Van Voorhis' notes, during the

---

[6] Heritage filed a voluntary petition for relief under ch. 11 of the Bankruptcy Code on May 17, 2004. See In re Heritage Org., L.L.C., 375 B.R. 230, 238-242 (Bankr. N.D. Tex. 2007) (discussing Heritage's activities and its relationship with its clients, as conducted before the filing of the bankruptcy petition).

[*6] meeting Mr. Rawls "asked a lot of questions about the people and who we are, mentioned that he didn't know us and [asked] how does he get credibility about our firm. He said he wanted information on the company, handouts, curricula vitae on all the members, the who and what of our expertise, and who are we, that kind of thing." Mr. Rawls met with Heritage representatives on several more occasions. He also spoke with several of Heritage's former clients and received positive references.

Mr. Rawls also discussed Heritage and its proposed strategies with his brother, Warren Rawls. Warren Rawls is a certified public accountant (C.P.A.) who used to work in Dallas. Warren Rawls told his brother that he asked his accounting colleagues in Dallas what they knew of Heritage, and he researched the transactions involved. After discussing Heritage with his brother, Mr. Rawls understood that Heritage had a positive reputation among Warren Rawls' Dallas colleagues and that the authority Heritage cited and its approach looked legitimate.

On March 21, 2000, Mr. Rawls paid Heritage a $22,500 initial fee and executed an agreement with Heritage (Heritage agreement). Heritage required that Mr. Rawls pay the $22,500 fee and sign the Heritage agreement before it presented the specifics of the plan. The Heritage agreement contained a nondisclosure clause which prevented Mr. Rawls from disclosing information about Heritage's

**[*7]** strategies. The Heritage agreement also provided that Heritage's fee was 25% of the reduction in Federal, State, and local taxes that Mr. Rawls claimed using a Heritage strategy. The Heritage agreement also contained a provision whereby Mr. Rawls acknowledged that he could not rely on Heritage for any advice.

Mr. Rawls understood the Heritage approach to be a structure of complex transactions providing a number of benefits, including estate planning protection as well as important tax advantages. Mr. Rawls believed the Heritage strategies were "investments where you had to put up real money but you had the real opportunity to profit." Furthermore, Mr. Rawls entered into the Heritage agreement to increase the diversification of his holdings and reduce the economic risk related to the volatility of the market price of his Finisar common stock.

Lewis Rice

Mr. Rawls, understanding that the Heritage agreement precluded him from relying on Heritage, sought the advice of an attorney. As discussed above, Mr. Rawls did not have a personal attorney in 2000. Heritage recommended two lawyers to Mr. Rawls. Mr. Rawls contacted both attorneys and ultimately selected Michael Mulligan of the law firm Lewis, Rice & Fingersh, L.C. (Lewis

**[*8]** Rice).[7]  Mr. Rawls selected Mr. Mulligan because of his impressive résumé in the estate planning field.  Mr. Mulligan received his law degree from Columbia University in 1971.  After graduating from law school, he clerked for U.S. District Judge William H. Webster in St. Louis, Missouri.  Since 1974 Mr. Mulligan has practiced in the area of estate planning and administration.  He also serves on the editorial board of Estate Planning Magazine and was serving on the board when Mr. Rawls hired him.  Mr. Mulligan was Mr. Rawls' principal contact at Lewis Rice.  Lewis Rice attorneys William J. Falk[8] and Lawrence H. Weltman[9] also performed work for Mr. Rawls.  Mr. Falk and Mr. Weltman were responsible for analyzing the income tax consequence of transactions at issue.

---

[7]  Before Mr. Rawls, Heritage had previously referred three to five clients to Lewis Rice.  During the course of Lewis Rice's relationship with Heritage, Heritage referred more than 20 clients to the firm.  Lewis Rice did not pay Heritage for the referral of Mr. Rawls and it did not receive any fees from Heritage related to the Rawls transactions.

[8]  Mr. Falk graduated from Suffolk University Law School in 1977 and earned his master of laws (LL.M.) in taxation from Washington University School of Law in 1982.  He is a tax specialist partner at Lewis Rice and at the time of trial was the head of the firm's tax department.

[9]  Mr. Weltman graduated from Washington University School of Law in 1968 and earned his LL.M. in taxation from New York University School of Law in 1970.

**[*9]** Mr. Rawls' engagement letter with Lewis Rice (Lewis Rice engagement letter) stated that Lewis Rice would "furnish legal services to you in connection with steps you are taking to protect your investment in Finisar Corporation and other aspects of your estate planning." The letter went on to state that the firm's services included "the preparation of documents implementing your planning decisions". Mr. Rawls paid Lewis Rice a $150,000 flat fee for his estate plan,[10] the firm's advice regarding the transactions at issue, and the preparation of the formation and transaction documents.[11]

The Group Transactions

The first set of transactions in these cases was implemented with a series of transactions that took place between March 28 and April 10, 2000, which we refer to collectively as the Group transactions.

On March 28, 2000, JSR Management Corp. (JSRMC) was incorporated in Texas. JRSMC issued 5,000 shares of common stock to Mr. Rawls for $5,000 cash. Mr. Rawls was JSRMC's president, sole shareholder, and sole director. On April 5, 2000, JSRMC filed Form 2553.

---

[10] Lewis Rice prepared a will, a revocable trust instrument, a durable power of attorney, and health care directives for Mr. Rawls in January 2001.

[11] For example, Lewis Rice drafted the sale and purchase agreements for various partnership interests, prepared the promissory notes, and made the State partnership filings for the partnerships.

[*10]    On March 29, 2000, Rawls Management Corp. (RMC) was incorporated in Texas.  RMC issued 55,000 shares of common stock to Mr. Rawls in exchange for $55,000 cash.  Mr. Rawls was RMC's president, sole shareholder, and sole director.  On April 5, 2000, RMC filed Form 2553.

On March 29, 2000, the Jerry S. Rawls Business Trust (Business Trust) was created.  In connection therewith, Mr. Rawls transferred to Business Trust:  (1) $5.8 million in cash; (2) 1,060,000 shares of common stock of Finisar; and (3) all of his stock in RMC (55,000 shares).  On March 30, 2000, Mr. Rawls filed an election for Business Trust to be a small business trust under section 1361(e)(3).

Also on March 29, 2000, the Jerry S. Rawls Family Trust (Family Trust) was created.  Mr. Rawls' brother, Warren Rawls, was appointed sole trustee.  The beneficiaries are, with the exception of Mr. Rawls, the descendants of Mr. Rawls' parents.  On March 30, 2000 Mr. Rawls transferred $250,000 as a gift to Family Trust.

Also on March 29, 2000, Business Trust and RMC formed Rawls Family, L.P. (Family), which would serve as the upper tier partnership.  Family was formed as a limited partnership under the laws of the State of Missouri.  Business Trust was a 99.99% limited partner, and RMC was a 0.01% general partner .[12]

---

[12]  The contributions made in connection with Family's formation were effective April 5, 2000, and are discussed infra p. 12.

[*11]   On March 30, 2000, Business Trust opened at Paine Webber two brokerage accounts, which we refer to as PW1 and PW2.  On April 3, 2000, Business Trust made a cash transfer of $5,724,000 to PW1.  On April 4, 2000, Business Trust borrowed in kind $200 million of U.S. Treasury notes from Paine Webber (April short sale liability) and sold the notes in the open market, receiving cash proceeds equal to $201,326,876, which it maintained in PW2.

Also on April 4, 2000, JSRMC and Business Trust formed Group, which would serve as the lower tier partnership.  In connection therewith, the following contributions were made:  (1) JSRMC contributed its own promissory note in the principal amount of $576 in exchange for a 0.01% general partner interest and (2) Business Trust contributed all of the assets and obligations of PW1 and PW2 (that is, $5.7 million in cash, the proceeds from the short sale, and the obligation to close the short sale) in exchange for a 99.99% limited partnership interest.[13]

---

[13]   On its Form 1065, U.S. Return of Partnership Income, for the short tax year beginning April 2 and ending April 6, 2000, filed February 18, 2001, Group did not account for the obligation to close the short sale as a partnership liability under sec. 752(a) and (b).  Thus, Business Trust presumably received an inflated outside basis in Group.  See discussion infra p. 22.

Outside basis refers to the basis of a partner's partnership interest.  See generally sec. 722 (providing that the basis of a partner's partnership interest acquired by the contribution of property other than money is the basis of the contributed property; and the basis of a partner's partnership interest acquired by

(continued...)

**[\*12]**  Effective April 5, 2000, the following contributions were made to Family: (1) RMC contributed its own promissory note in the principal amount of $16,111 and (2) Business Trust contributed its entire interest in Group and 1,060,000 shares of Finisar common stock.[14]

On April 6, 2000, JSRMC and Family sold their partnership interests in Group to Family Trust in exchange for separate promissory notes from Family Trust in the original principal amounts of $523 and $4,732,226, respectively.[15] Following this sale, all ownership interests in Group were held by Family Trust.

---

[13](...continued)
the contribution of money is the amount of money contributed); sec. 752(a) (providing that the basis of a partner's partnership interest is increased to the extent of the partner's increased share of partnership liabilities); sec. 752(b) (providing that the basis of a partner's partnership interest is decreased to the extent of the partner's decreased share of partnership liabilities); sec. 705 (providing rules for subsequent adjustments to the basis of a partner's partnership interest, following its initial determination at the time of original acquisition, to reflect the partnership's operating results and the partner's distributive shares of partnership income, gain, loss, deduction and credit); sec. 733 (providing rules for adjustments to the basis of a partner's partnership interest to account for distributions from the partnership to the partner).

[14]  Family, presumably under authority of sec. 723, inherited Business Trust's inflated outside basis.

[15]  Mr. Rawls subsequently sold his interest in JSRMC to Heritage.

[*13] Group, now presumably a "single member disregarded entity",[16] continued to remain liable for the obligation to close the short sale.

On April 10, 2000, Family Trust closed the short sale positions, generating a short-term capital loss of approximately $387,500. On April 20, 2000, Family Trust repaid JRSMC and Family for the promissory notes issued in exchange for Family Trust's purchase of Group. Family subsequently transferred the proceeds it received from Family Trust to its partners, Business Trust and RMC.

Family, as a result of the sale of its Group interest, claimed a short-term capital loss for Federal income tax purposes of $202,418,954. The amount of the loss is the difference between the amount realized ($4,732,226) and Family's adjusted basis in its Group limited partner interest ($207,151,180). Almost the entire amount of this loss was the result of the overstatement of Family's basis in its partnership interest in Group. This overstatement, in turn, arose from Group's failure to account for the obligation to close the short sale.

In connection with Finisar's secondary offering on April 7, 2000, Family sold for cash 635,297 shares of its Finisar common stock, generating a long-term

---

[16] See secs. 301.7701-1(a)(4) (providing that "certain organizations that have a single owner can choose to be recognized or disregarded as entities separate from their owners"), 301.7701-3(b)(1)(ii) (providing that a domestic entity is "[d]isregarded as an entity separate from its owner if it has a single owner."), Proced. & Admin. Regs.

**[\*14]** capital gain for Federal income tax purposes of $61,052,042 after a 3.9% commission.

Lewis Rice Advice Regarding Group Transactions

Lewis Rice prepared all the documents in connection with the Group transactions. Lewis Rice also drafted a "more-likely-than-not" opinion letter. In the draft, Lewis Rice concluded that: (1) the obligation to close the short sale was not a partnership tax liability within the meaning of section 752, (2) the partnership-abuse rules set forth in section 1.701-2, Income Tax Regs., would not apply to the Group transactions, and (3) the judicial substance over form and step transaction doctrines would not apply to the Group transactions.

However, Lewis Rice ultimately decided not to issue an opinion letter with regard to the Group transactions. While preparing the opinion letter, Mr. Falk raised concerns that section 267 (relating to losses, expenses, and interest with respect to transactions between related parties) could potentially apply to disallow the loss as a sale between related parties. Heritage disagreed with Lewis Rice that section 267 could apply. During their discussions regarding section 267, Heritage and Lewis Rice decided the transactions needed to be done again. In a subsequent meeting with Mr. Rawls, Heritage and Lewis Rice informed Mr. Rawls of Lewis Rice's concerns regarding section 267, and that, while Heritage disagreed with

[*15] Lewis Rice about the application of section 267, another transaction needed to be done.

The Trading Transactions

The second set of transactions at issue in these cases was implemented with a series of transactions that took place between August 17 and October 25, 2000, which we refer to collectively as the Trading transactions.

On August 17, 2000, Rawls Trading, L.P. was formed[17] with RMC as the sole general partner and Business Trust as the sole limited partner.[18]  On August 22, 2000, Business Trust opened a brokerage account at Donaldson, Lufkin & Jenrette (DLJ account).  Shortly thereafter, Business Trust transferred $6 million in cash to the DLJ account.

On August 29, 2000, the following contributions were made to Family:  (1) Business Trust contributed 5,461,679 shares of Finisar common stock and (2) RMC contributed its own promissory note in the principal amount of $23,656.

On August 30, 2000, Business Trust borrowed in kind $200 million face value Treasury notes from Donaldson, Lufkin & Jenrette (August short sale

---

[17] Trading was formed as a limited liability partnership in Missouri.

[18] The contributions made in connection with Trading's formation were effective September 1, 2000, and are discussed infra p. 16.

[*16] liability).  That same day, Business Trust sold the Treasury notes in the open

market for $199,906,250, net of commissions, which it maintained in the DLJ

account.

On September 1, 2000, the following capital contributions were made to

Trading:  (1) RMC contributed its own promissory note in the principal amount of

$20,648 in exchange for a 0.01% general partnership interest and (2) Business Trust

contributed all of the assets and obligations of the DLJ account (that is, $6 million in

cash, the proceeds of the short sale and the obligation to close the short sale) in

exchange for a 99.99% limited partner interest.[19]

On September 5, 2000, the following additional capital contributions were

made to Family:  (1) Business Trust contributed all of its ownership interest in

Trading and (2) RMC contributed its own promissory note in the original principal

amount of $601.

On September 7, 2000, RMC and Family collectively sold their partnership

interests in Trading to West Coast Business Trust (West Coast) in exchange for

separate promissory notes from West Coast in the original principal amounts of

---

[19] On its partnership return for the short tax year beginning August 17 and
ending September 7, 2000, filed July 17, 2001, Trading did not account for the
obligation to close the short sale as a partnership liability under sec. 752(a) and (b).
Thus, Business Trust presumably received an inflated outside basis in Trading.  See
discussion infra pp. 22-23.

**[\*17]** $476 and $4,753,056, respectively. West Coast's sole trustee was Gary M. Kornman, a "key" principal at Heritage, and the individual who controlled Heritage. West Coast held the interest in Trading as a nominee for Valiant Investments, 95-2, L.P.

Following the sale of Trading to West Coast, all of the ownership interests in Trading were held by West Coast. Trading, now presumably a "single member disregarded entity",[20] continued to remain liable for the obligation to close the short sale.

As a result of the sale of its Trading interest, Family claimed a short-term capital loss for Federal income tax purposes of $201,951,603. The amount of the loss is the difference between the amount realized ($4,753,056) and Family's adjusted basis in its limited partner interest in Trading ($206,704,659). Almost the entire amount of this loss was the result of the overstatement of Family's basis in its partnership interest in Trading. This overstatement, in turn, arose from Trading's failure to account for the obligation to close the short sale.

On September 8, 2000, Valiant partially closed the short sale positions by purchasing $45 million of Treasury notes. On October 25, 2000, Valiant fully

---

[20] See supra note 16 (citing the applicable regulations defining a "single member disregarded entity").

[*18] closed the short sale positions by purchasing an additional $155 million of Treasury notes.  On November 21, 2000, Valiant repaid with interest its $4,753,056 note to Family and its $476 note to RMC.

Lewis Rice Advice for Trading Transactions

In October 2000 Lewis Rice began drafting an opinion letter for Mr. Rawls with respect to the Trading transactions.  In connection therewith, the firm drafted written representations for Mr. Rawls' approval, which stated the facts of the Trading transactions.  Lewis Rice drafted the representations on the basis of its discussions with Mr. Rawls, its discussions with Heritage personnel, and its firsthand knowledge from drafting the documents and implementing the transactions.

After reviewing the representations for completeness and accuracy, Mr. Rawls signed the representations on October 7, 2000.  The representations list Mr. Rawls' significant objectives in the transactions, including the objectives to "[r]ealize a profit by taking one or more short positions in Treasury Notes" and to "[r]educe, to the extent possible, the income tax due as a result of the dispositions of the Finisar common stock".

On October 16, 2000, Lewis Rice gave Mr. Rawls a legal opinion on the consequences of the Trading transactions.  The opinion concluded that:  (1) the

[*19] obligation to close the short sale was not a partnership tax liability within the meaning of section 752, (2) the partnership antiabuse rules set forth in section 1.701-2, Income Tax Regs., would not apply to the Trading transactions, and (3) the judicial substance over form and step transaction doctrines would not apply to the Trading transactions.

Mr. Poster

In 2000 Mr. Rawls' personal accountant was Russell Payne of Fort Worth, Texas. Mr. Payne had been preparing Mr. Rawls' individual tax returns since the 1970s. Mr. Rawls' individual tax returns had previously been "very uncomplicated and very straightforward". To prepare the returns involved in the Group and Trading transactions, Mr. Rawls decided it would be best to hire an accountant who was familiar with the California income tax and had experience with the entities involved. Additionally, Mr. Rawls sought out a new accountant because he knew Mr. Payne was nearing retirement.

Heritage recommended two accountants to Mr. Rawls, one of whom was Lawrence Poster.[21] Mr. Rawls considered both accountants and ultimately

---

[21] In 2000, Heritage referred three or four clients, including Mr. Rawls, to Mr. Poster. It appears from the record that Mr. Rawls was the first client that Heritage referred to Mr. Poster. Mr. Poster did not have a referral agreement with

(continued...)

[*20] selected Mr. Poster[22] after reviewing his resume and interviewing him over the phone. Mr. Poster graduated from Cornell Law School in 1969 and became a certified public accountant in 1973. After law school Mr. Poster worked at Touche Ross & Co. (which is now part of Deloitte) in New York, New York, for five years. He then worked as a manager for Richard A. Eisner & Co. in New York for two years. Mr. Poster subsequently worked for the accounting firm Peat Marwick (which is now part of KPMG), where he was a tax partner for 13 years. In 1994 he left Peat Marwick to open his own office in Rancho Santa Fe, California. Since then Mr. Poster has been a solo practitioner providing tax and accounting services to a variety of clients, including individuals, estates and trusts, and privately held businesses.

Mr. Poster also had experience evaluating section 752 issues in short sale transactions. In 1999 Joseph Fernandez hired Mr. Poster to review a transaction Heritage proposed involving short sales.[23] Mr. Fernandez was not referred to Mr.

---

[21](...continued)
Heritage. Mr. Poster never received referral fees from Heritage and he never paid Heritage for the referrals. The clients Heritage referred to Mr. Poster made up only 10% or less of his clientele.

[22] Mr. Rawls hired Mr. Poster to prepare the tax returns for JRSMC, RMC, Business Trust, Family Trust, Family, Trading, and Group.

[23] Mr. Fernandez and his family are still clients of Mr. Poster.

[*21] Poster by Heritage. Mr. Fernandez's attorney, Allen Rich, introduced him to Mr. Poster. Mr. Poster was hired to independently review the transaction proposed by Heritage. Similar to Mr. Rawls' transactions, Mr. Fernandez's transactions revolved around section 752 and short sales. Mr. Poster researched the issues and reviewed the relevant authorities, including the article "Short-Sale Obligations and Basis in Partnership Interests" by Alice Welt Cunningham.[24] He also reviewed an opinion letter prepared for Mr. Fernandez by the law firm Ahrens & DeAngeli. While reviewing the transactions, Mr. Poster met with Mr. Fernandez's attorneys and Heritage employees. Mr. Poster ultimately concluded that the short-sale obligation was not a liability under section 752.

2000 Returns

Before Mr. Poster prepared the returns involved, he discussed the transactions with Mr. Rawls, verified the underlying facts with Heritage, and reviewed the Lewis Rice opinion letter. Mr. Poster's position regarding section 752 remained the same as it had been the year before, that a short-sale obligation was not a liability for purposes of section 752. While preparing Family's return, Mr. Rawls and Mr. Poster specifically discussed whether to include the Group transactions on Family's return when Lewis Rice had issued an opinion letter for

---

[24] 72 Tax Notes 1663 (1996).

[*22] only the Trading transactions. Mr. Poster advised Mr. Rawls that it was proper to report the Group transactions on Family's return. Mr. Rawls and Mr. Poster did not discuss minimizing the likelihood of audit, and they assumed the returns reporting the transactions would be audited. Mr. Rawls was emphatic with Mr. Poster that they be in compliance with the Code. Mr. Poster charged his normal hourly rate for preparation of the returns.

On February 14, 2001, Mr. Poster filed Group's Form 1065 for its tax year beginning April 2, 2000, and ending April 6, 2000. On Business Trust's Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., Group reported that Business Trust's capital contribution was $207,084,560. Group did not report the obligation to close the April short sale as a liability on the Group 2000 return and did not account for it when determining Business Trust's capital contribution. Group reported that Business Trust received a $207,117,867 withdrawal and distribution upon Business Trust's transfer of its 99.99% interest in Group to Family.

On July 17, 2001, Mr. Poster filed Trading's Form 1065 for its tax year beginning August 17, 2000, and ending September 7, 2000. On Business Trust's Schedule K-1, Trading reported that Business Trust's capital contribution was $206,456,894. Trading did not report the obligation to close the August short sale

[*23] as a liability on its 2000 return and did not account for it when determining Business Trust's capital contribution. Trading reported on its return that Business Trust received a $206,633,851 withdrawal and distribution upon Business Trust's transfer of its 99.99% interest in Trading to Family.

On October 15, 2001, Family filed a Form 1065 for its tax year beginning March 29, 2000, and ending December 31, 2000. The return reported a long-term capital gain of $61,052,042 on the sale of 635,297 shares of Finisar stock. Family reported that Business Trust's capital contribution was $413,541,454 and RMC's capital contribution to be $36,759. Family claimed a $202,418,954 short-term capital loss on the sale of Group and a $201,951,603 short-term capital loss on the sale of Trading. Family, when calculating these losses, did not include any deemed distributions of money it received that were due to the decrease in its liabilities from the assumption of the obligation to close the April short sale by Family Trust and the obligation to close the August short sale by West Coast.

On October 15, 2001, Mr. Poster filed Business Trust's Form 1041, U.S. Income Tax Return for Estates and Trusts, for its tax year beginning March 29, 2000, and ending December 31, 2000. On the return, Business Trust offset its 99.99% share of Family's capital gains with its 99.99% share of Family's capital

[*24] losses on the sale of Group and Trading. Business Trust issued a Schedule K-1 to Mr. Rawls showing no taxable income.

Mr. Poster also filed 2000 returns for JSRMC, RMC, and Family Trust.

On October 15, 2001, Mr. Rawls timely filed a Form 1040, U.S. Individual Income Tax Return, for 2000 prepared by Mr. Payne. Mr. Rawls reported a $1,192,138 capital loss from Business Trust on the return. Mr. Rawls' 2000 return also shows that he donated more than $38 million in Finisar stock to Texas Tech University (785,675 shares), Purdue University (233,408 shares), and the Air Force Village Foundation (34,124 shares). Mr. Rawls deducted $208,719 of his charitable contributions, leaving $37,935,746 in unused charitable contributions.

Subsequent Events

Group was dissolved on April 5, 2000, and did not file a Form 1065 after 2000. On October 16, 2007, Trading filed a Form 1065 for its tax year ending December 31, 2006. The return was marked as Trading's final return. Trading did not file a tax return for 2007.

In 2006 Mr. Poster began preparing Mr. Rawls' personal return and has since been Mr. Rawls' personal tax return preparer.

As of the date of trial Family Trust, Business Trust, Family, and RMC were still in existence. As of the date of trial, Mr. Rawls continued to control Family.

[*25] At that time Family's assets included shares of stock in Finisar and other companies; bonds; and private equity, mutual fund, and hedge fund holdings exceeding $67 million in value.

FPAAs and Family Dismissal

On March 9, 2007, respondent timely mailed: (1) an FPAA of Group's partnership items (Group FPAA) to JSRMC as Group's tax matters partner; (2) an FPAA of Trading's partnership items (Trading FPAA) to RMC as Trading's tax matters partner; and (3) an FPAA of Family's partnership items (Family FPAA) to RMC as Family's tax matters partner.

In the FPAAs, the IRS adjusted the following items of Group and Trading: (1) distributions of property other than money; (2) partnership liabilities; (3) capital contributed during the year; (4) other decreases on Schedule M-2, Analysis of Partners' Capital Accounts (distributions to a former partner due to section 708 termination); and (5) recharacterization of the partnerships under the sham transaction, the partnership anti-abuse rules, and the economic substance doctrine. The FPAAs also determined accuracy-related penalties at a rate of either 20% or 40% on the underpayment of tax attributable to the above adjustments.

On June 6, 2007, RMC timely filed a petition for adjustment of Trading's partnership items as set forth in the Trading FPAA and a petition for adjustment of

**[\*26]** Family's partnership items as set forth in the Family FPAA. On July 2, 2007, a petition for readjustment of the partnership items of Group as set forth in the Group FPAA was filed.

On December 30, 2008, petitioners filed a motion to consolidate the Group, Trading, and Family cases. On September 24, 2008, respondent filed a motion to stay the partner-level proceedings initiated in response to the Family FPAA. On March 17, 2009, we granted petitioners' motion to consolidate the Group, Trading, and Family cases. On January 27, 2009, we denied respondent's motion to stay the Family case without prejudice. A trial was conducted the week of January 11, 2010, in Dallas, Texas. On March 26, 2012, this Court dismissed Family for lack of jurisdiction by order accompanying our Opinion Rawls Trading, L.P., v. Commissioner, 138 T.C. 271.

OPINION

I. Adjustments in FPAA

The Commissioner's determinations in an FPAA are generally presumed correct, and a party challenging an FPAA has the burden of proving that the Commissioner's determinations are in error. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933); see also Republic Plaza Props. P'ship v. Commissioner, 107 T.C. 94, 104 (1996) ("Petitioner bears the burden of proving that respondent's

[*27] determinations in the FPAA are erroneous"); <u>Clovis I v. Commissioner</u>, 88 T.C. 980, 982 (1987) (an FPAA is the functional equivalent of a notice of deficiency).

Petitioners have failed to meet their burden of proving respondent's determinations in the Group FPAA and the Trading FPAA regarding the understatement of tax are incorrect. Petitioners offered no evidence and advanced no argument at trial establishing that respondent's determinations in the Group FPAA and the Trading FPAA are wrong.[25] Furthermore, petitioners did not address this issue in their posttrial brief, and thus we consider it waived or abandoned. See <u>Bradley v. Commissioner</u>, 100 T.C. 367, 370 (1993) ("Petitioner has not pursued this line of objection on brief, and we consider it abandoned."); <u>Stringer v. Commissioner</u>, 84 T.C. 693, 706 (1985) ("On numerous occasions, we in essence have defaulted or dismissed issues for failure to brief them. Generally, we have accomplished this result by considering the issue waived or conceded."),

---

[25] On January 11, 2010, petitioners filed the following concessions with respect to Family with the Court stating that Family and its partners (RMC and Business Trust) conceded: (1) the limitation by sec. 165(c)(2) of the loss claimed by Family on the sale of its interest in Group; (2) the limitation by sec. 165(c)(2) of the loss claimed by Family on the sale of its interest in Trading; and (3) the at-risk adjustments under sec. 465(b)(1). Respondent asked the Court to reject petitioners' concessions. Because Family was ultimately dismissed for lack of jurisdiction in <u>Rawls Trading L.P. v. Commissioner</u>, 138 T.C. 271, we do not decide whether to accept Family's concessions.

[*28] aff'd without published opinion, 789 F.2d 917 (4th Cir. 1986); Lime Cola Co. v. Commissioner, 22 T.C. 593, 606 (1954) ("Petitioners in their brief do not argue anything about transferee liability; and, although they do not expressly abandon the issue of transferee liability, we presume they no longer press it."); Stonegate of Blacksburg, Inc. v. Commissioner, T.C. Memo. 1974-213 ("Since petitioner did not consider this issue in either its original or reply briefs, we consider it to have been conceded."). Accordingly, respondent's determinations in the Group FPAA and the Trading FPAA are sustained, including that Group and Trading should be disregarded for tax purposes. Petitioners are deemed to have conceded this issue.

## II. Jurisdiction Over Penalties

Having decided that Group and Trading are disregarded for Federal income tax purposes, we have jurisdiction to determine the validity of partnership-level defenses to the accuracy-related penalties respondent proposed. See Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67, 150-155 (2012) (holding that where the overstatement of a purported partner's basis in property received upon liquidation of a disregarded partnership is attributable to claiming that capital contributions were made to the partnership, the underpayment of tax resulting from the sale of that property is attributable to the reduction to zero of the claimed

**[\*29]** capital contributions to the partnership, and the Court has jurisdiction to determine the applicability of the gross valuation misstatement penalty to the loss resulting from the sale of the property).

III.  Section 6662 Penalties and Reasonable Cause Defense

Section 6662(a) and (b)(1), (2), and (3) provides that a taxpayer may be liable for a 20% accuracy-related penalty on the portion of an underpayment of income tax attributable to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. Section 6662(h)(1) increases the 20% rate to a 40% rate to the extent that the underpayment is attributable to a gross valuation misstatement.  An accuracy-related penalty under section 6662 does not apply to any portion of an underpayment of tax for which a taxpayer had reasonable cause and acted in good faith.  Sec. 6664(c)(1).

The determination of reasonable cause and good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess the proper tax liability.  Id.  In order for the reasonable cause exception to apply, the taxpayer must prove that he exercised ordinary business care and prudence as to the disputed item.  See Neonatology Assocs.,

[*30] P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Petitioners bear the burden of proving that they meet the requirements for relief under the section 6664(c)(1) reasonable cause exception. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

The determination of reasonable cause and good faith is made "at the partnership level, taking into account the state of mind of the general partner." Superior Trading, LLC v. Commissioner, 137 T.C. 70, 91 (2011) (citing New Millennium Trading, LLC v. Commissioner, 131 T.C. 275 (2008)). Mr. Rawls, as the sole owner of JSRMC (the general partner of Group), was the only individual with the authority to act on behalf of Group. Similarly, Mr. Rawls, as the sole owner of RMC (the general partner of Trading), was the only individual with the authority to act on behalf of Trading. Consequently, it is Mr. Rawls' conduct at the time that the Group and Trading transactions were executed that is relevant for the purpose of determining whether we should sustain the asserted accuracy-related penalties.

Petitioners argue we should not sustain the accuracy-related penalties because Mr. Rawls reasonably relied on the advice of Lewis Rice and Mr. Poster. Reliance upon the advice of a tax professional may establish reasonable cause and good faith for the purpose of avoiding liability for the section 6662(a) penalty.

**[*31]** See United States v. Boyle, 469 U.S. 241, 250 (1985). Whether reasonable cause exists when a taxpayer has relied on a tax professional to prepare a return must be determined on the basis of all of the facts and circumstances. See Neonatology Assocs., P.A. v. Commissioner, 115 T.C. at 98. The taxpayer claiming reliance on a tax professional must prove by a preponderance of evidence that it satisfies each prong of the following test: "(1) the adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Id. at 99. Reliance may be unreasonable, however, if the adviser is a promoter of the transaction or suffers from "an inherent conflict of interest that the taxpayer knew or should have known about." Id. at 98.

Before we analyze petitioner's claim using the three-prong test stated above, we determine whether Lewis Rice and Mr. Poster were promoters of the transactions.

A. Promoters

Respondent argues that Mr. Rawls cannot rely on the attorneys at Lewis Rice and Mr. Poster because they were promoters. Our Court has defined promoter as "'an adviser who participated in structuring the transaction or is

**[\*32]** otherwise related to, has an interest in, or profits from the transaction.'" <u>106</u>

<u>Ltd. v. Commissioner</u>, 136 T.C. 67, 79-80 (2011) (quoting <u>Tigers Eye Trading, LLC</u>

<u>v. Commissioner</u>, T.C. Memo. 2009-121), <u>aff'd,</u> 684 F.3d 84 (D.C. Cir. 2012). We,

however, have stated that an adviser is not a promoter of a transaction when he:

- has a long-term and continual relationship with his client;
- does not give unsolicited advice regarding the tax shelter;
- advises only within his field of expertise (and not because of his regular involvement in the transaction being scrutinized);
- follows his regular course of conduct in rendering his advice; and
- has no stake in the transaction besides

<u>Id.</u> at 80 (citing <u>Countrywide Ltd. P'ship v. Commissioner</u>, 132 T.C. 347, 352-355

(2009)).

In <u>106 Ltd.</u>, an attorney suggested a Son-of-BOSS transaction to one of his

clients. <u>Id.</u> at 69-70. The client's accountants reviewed the proposed transaction

and approved it. <u>Id.</u> at 70. The attorney handled all the paperwork for the

transaction, including setting up the entities involved. <u>Id.</u> at 71. The accountants

prepared the returns involved; but instead of charging their normal fee, they charged

a flat fee of $8,000, which was $6,500 more than their usual fee. <u>Id.</u> at 81. The

Court found that both the attorney and the accountants were promoters. <u>Id.</u> at 80-

81. The Court noted that the attorney was not "being paid to evaluate the deal

**[\*33]** or tweak a real business deal to increase its tax advantages; he was being paid to make it happen". <u>Id.</u> at 81. As for the accountants, the Court concluded that their flat fee was not based on the complexity of the returns involved but instead found it to be "the firm's cut for helping to make the deal happen." <u>Id.</u> Ultimately the Court concluded that because the attorney and the accountants "structured the transaction and profited from its implementation", they were promoters. <u>Id.</u> The Court of Appeals for the District of Columbia Circuit, when affirming our decision, noted that an adviser's involvement in preparation of documents required to implement a Son-of-BOSS transaction supports a finding that the advisor was a promoter. <u>106 Ltd. v. Commissioner</u>, 684 F.3d at 90-91 (citing <u>New Phoenix Sunrise Corp. v. Commissioner</u>, 408 Fed. Appx. 908, 917 (6th Cir. 2010), <u>aff'g</u> 132 T.C. 161 (2009)).

We find on the basis of the above that Lewis Rice was a promoter. Like the lawyer in <u>106 Ltd.</u>, the Lewis Rice lawyers were not being paid to evaluate a deal or to tweak it; they were being paid to make the transactions happen. They did more than simply evaluate Heritage's strategies; they implemented them. They created the entities involved and prepared all the paperwork involved. Therefore, Mr. Rawls cannot rely on the advice of Lewis Rice because it was a promoter of the transactions involved.

**[*34]**   However, we find that Mr. Poster was not a promoter and Mr. Rawls can rely on his advice if he satisfies the three-prong test.  Unlike the advisers in 106 Ltd., Mr. Poster did not introduce or suggest the transaction to Mr. Rawls and he did not coordinate the transaction.  Mr. Poster was advising Mr. Rawls within his field of expertise, and he followed his regular course of conduct in rendering his advice.  Furthermore, his compensation did not depend on the outcome of the transactions, and he charged his normal hourly rate.

We disagree with respondent that Mr. Poster was a promoter because Heritage referred three or four clients, including Mr. Rawls, to Mr. Poster in 2000. Heritage did not tell Mr. Rawls he had to hire Mr. Poster, and Mr. Poster was not the only accountant Heritage recommended.  There was no referral agreement between Heritage and Mr. Poster, and Mr. Poster never received referral fees from Heritage; nor did he pay any referral fees to Heritage.  There is nothing to suggest that Mr. Poster had a financial stake in the transactions because he was one of two accountants recommended by Heritage, nor is there anything to suggest that Mr. Poster was unable to give objective, independent advice to Mr. Rawls.

Mr. Poster was not a promoter; thus, if petitioners can establish that Mr. Rawls reasonably relied on him under the three-prong test discussed above, the accuracy-penalties will not be sustained.

**[\*35]** B. <u>Competent Professional With Sufficient Expertise</u>

We find that Mr. Poster was a competent professional. Mr. Poster graduated from Cornell Law School, was a certified public accountant, and had almost 30 years of experience in tax when Mr. Rawls hired him, including 13 years as a tax partner at a major accounting firm. Not only was Mr. Poster a competent tax return preparer; he also had knowledge of the relevant aspects of Federal tax law. He had experience evaluating short sales involving section 752 issues. <u>Cf.</u> sec. 1.6664-4(c)(1), Proced. & Admin. Regs. ("[R]eliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law.").

Respondent argues that Mr. Poster was not a competent professional because he failed to secure certain representations from Mr. Rawls and he did not consider the application of sections 165 and 465. Respondent is essentially arguing that Mr. Poster cannot be a competent adviser because Mr. Poster was incorrect in his advice to Mr. Rawls. However, an adviser can still be competent and the taxpayer can still rely on the adviser even if the advice given turns out to be incorrect. <u>See</u> <u>Stanford v. Commissioner</u>, 152 F.3d 450, 461 (5th Cir. 1998) (finding reliance on the adviser reasonable even when his legal interpretation of a Code section turned out to be incorrect and the cause of the substantial

[*36] understatement of tax), aff'g in part, rev'g in part 108 T.C. 344 (1997);

Longoria v. Commissioner, T.C. Memo. 2009-162 (finding the taxpayer's reliance

on his accountant's advice reasonable even if the accountant acted unreasonably in

dispensing it).  As the Supreme Court stated in Boyle, 469 U.S. at 251:

> When an accountant or attorney advises a taxpayer on a matter
> of tax law, such as whether a liability exists, it is reasonable for the
> taxpayer to rely on that advice.  Most taxpayers are not competent to
> discern error in the substantive advice of an accountant or attorney.  To
> require the taxpayer to challenge the attorney, to seek a "second
> opinion," or to try to monitor counsel on the provisions of the Code
> himself would nullify the very purpose of seeking the advice of a
> presumed expert in the first place.  * * *

C.  Necessary and Accurate Information

We find that Mr. Rawls provided Mr. Poster with all the relevant information

needed to assess the correct level of income tax.  Mr. Poster and Mr. Rawls

discussed the transactions while preparing the returns, Mr. Rawls gave Mr. Poster

the Lewis Rice opinion letter, and Mr. Poster was given access to Heritage

personnel so that he could verify the facts of the transactions.

Respondent argues that Mr. Rawls did not provide Mr. Poster with

necessary and accurate information because he did not tell Mr. Poster that Lewis

Rice declined to issue an opinion letter with respect to the Group transactions.

Mr. Rawls did not tell Mr. Poster this because, as he testified:  "I think he knew

[*37] that; I didn't have to tell him." Furthermore, Mr. Rawls and Mr. Poster specifically discussed whether the Group transaction should be reported on Family's return even though there was not an opinion letter. There is nothing in the record to suggest that Mr. Rawls hid from Mr. Poster that Lewis Rice did not issue an opinion letter with respect to the Group transactions.

Respondent also argues that Mr. Rawls did not inform Mr. Poster of his tax reduction motivations and the fact that Heritage's fee was based on tax savings. There is nothing in the record to suggest that Mr. Rawls hid these facts from Mr. Poster. One of the reasons clients seek the advice of lawyers and accountants is that those advisers know what information is important and what questions to ask. Mr. Rawls provided the information he thought was necessary. See Longoria v. Commissioner, T.C. Memo. 2009-162 ("It was not * * * [the taxpayer's] fault that his C.P.A. did not ask him more questions or request more documentation regarding the underlying lawsuit and the relationship of his physical injuries to it. We do not blame * * * [the taxpayer] for his C.P.A.'s erroneous conclusion of law.").

D. Good-Faith Reliance

We conclude that Mr. Rawls relied in good faith on Mr. Poster's advice. Mr. Rawls credibly testified that he was "very emphatic with Larry that we should

[*38] absolutely be compliant with the Tax Code and complete in our disclosure, and he said we absolutely were." This is consistent with Mr. Poster's testimony that they had "always assumed that these transactions would be audited."

We find that Mr. Rawls relied in good faith on Mr. Poster, because there was nothing to suggest to a person of Mr. Rawls' education and experience that the advice was wrong or that the transactions were too good to be true. In Stobie Creek Invs., LLC v. United States, 608 F.3d 1366, 1383 (Fed. Cir. 2010), the Court of Appeals for the Federal Circuit found that the taxpayer should have known the Son of BOSS transaction was "too good to be true" because of his "extensive experience in finance, having worked as an investment banker and as the manager of his family's complex finances". The taxpayer, as manager of his family's complex finances, had "helped implement a number of sophisticated tax-planning strategies, giving him sufficient knowledge and experience to know when a tax planning strategy was likely 'too good to be true.'" Id. In SAS Inv. Partners v. Commissioner, T.C. Memo. 2012-159, we concluded that the taxpayer, because he had an accounting degree and was a certified financial planner, should have known that the Son of BOSS transaction was improper.

Mr. Rawls is an accomplished engineer and has cofounded a very successful fiber optics company; however, unlike the taxpayers in Stobie Creek and SAS

**[*39]** <u>Inv. Partners</u>, Mr. Rawls is not a sophisticated investor and is not familiar with tax law.  Before the success of Finisar, Mr. Rawls' wealth consisted of the equity in his home, which was subject to two mortgages in order to finance Finisar.  Mr. Rawls was not familiar with managing a large fortune and, as of early 2000, he did not have an estate plan or even a will.  We find that Mr. Rawls did not have the background or experience necessary to have known that the Heritage plan was too good to be true.

Furthermore, the sizable tax savings do not automatically create a "too good to be true situation".  Mr. Rawls did find the results of Heritage's strategies impressive, but he also testified that he understood Heritage's strategies to be "investments where you had to put up real money but you had the real opportunity to profit".  <u>See</u> <u>Am. Boat Co., LLC v. United States</u>, 583 F.3d 471, 485 (7th Cir. 2009) (finding reasonable cause when taxpayer was a credible witness and he did not know the transaction held no profit potential).  In <u>Am. Boat</u>, the Government argued that the taxpayer should have known the Son-of-BOSS transaction was too good to be true on account of the "substantial tax benefit" he received from the short-sale transactions.  <u>Id.</u>  The Court of Appeals rejected the Government's argument, stating:  "There is no doubt that the benefit * * * [the taxpayer] received was large, and this is the argument that gets the government the nearest to

**[\*40]** undermining * * * [the taxpayer's] assertion that he had reasonable cause. But, in general, 'it is axiomatic that taxpayers lawfully may arrange their affairs to keep taxes as low as possible.'" Id. (quoting Neonatology Assocs., P.A. v. Commissioner, 299 F.3d at 232-233 (citing Gregory v. Helvering, 293 U.S. 465, 469 (1935))).

Furthermore, we do not find it unreasonable for Mr. Rawls to have relied on Mr. Poster's advice to report the Group transactions on Family's return even though Lewis Rice declined to issue an opinion letter. Mr. Rawls was aware that Mr. Kornman disagreed with Lewis Rice's concerns regarding the Group transactions and that Mr. Kornman was confident the transaction was valid and in compliance with the Code. Faced with a difference of opinion between Heritage and Lewis Rice, Mr. Rawls discussed with Mr. Poster whether the Group transactions should be reported on Family's return. Mr. Poster informed Mr. Rawls that after reviewing the Lewis Rice opinion letter regarding the Trading transactions he thought it was proper to also report the Group transactions on Family's return. It was reasonable for Mr. Rawls to rely on his accountant when faced with the question of whether to report the Group transactions on Family's return.

**[\*41]**  Respondent argues that Mr. Rawls did not in good faith rely on Mr. Poster because he hid the transactions from Mr. Payne, his personal income tax return preparer.  We do not find that Mr. Rawls lacked good faith because he decided to use Mr. Poster instead of Mr. Payne for more complicated income tax returns. There were several legitimate reasons for Mr. Rawls' not using Mr. Payne that have nothing to do with hiding information from Mr. Payne.  By 2000 Mr. Rawls was living in California and subject to California income tax, with which Mr. Payne was unfamiliar.  Furthermore, Mr. Rawls' income tax returns had gone from being "very uncomplicated and very straightforward" to more complex after the success of Finisar, and Mr. Payne was nearing retirement.  Mr. Rawls decided it was best to hire an accountant who was familiar with California law, short sales, section 752, and the entities involved, and that is why he hired Mr. Poster.  Mr. Poster continued to do work for Mr. Rawls, and Mr. Poster has been preparing Mr. Rawls' personal income tax return since 2006.  Mr. Rawls was not acting in bad faith when he hired Mr. Poster to prepare the tax returns involved.

E.  Conclusion

We find that Mr. Rawls relied in good faith on a competent adviser who had accurate and necessary information.  Therefore, on the basis of the facts and circumstances of these cases, petitioners have established the reasonable cause and

**[\*42]** good faith defense of section 6664(c)(1), and the section 6662 penalties do not apply.

In reaching our holding herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.